

CV20941774                    115504118



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed: COMPLAINT**
**December 21, 2020 14:03**

By: PAUL J. CRISTALLO 0061820

Confirmation Nbr. 2140576

PAULA KIEKISZ, ADMIN. OF BRENDEN KIEKISZ                    CV 20 941774
ESTATE

      vs.

                                     **Judge:**  JOHN J. RUSSO

CUYAHOGA COUNTY BOARD OF
COMMISSIONERS, ET AL

Pages Filed:  76

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| PAULA KIEKISZ, as Mother and<br>Administrator of the Estate of<br>BRENDEN JOHN KIEKISZ, Deceased,<br>℅ The Law Office of Paul J. Cristallo<br>4403 ST. CLAIR AVENUE<br>CLEVELAND, OH 44103<br><br>       Plaintiff<br><br>   -vs-<br><br>CUYAHOGA COUNTY BOARD OF<br>COMMISSIONERS/<br>CUYAHOGA COUNTY<br>2073 East Ninth Street<br>Cleveland, Ohio 44115<br><br>and<br><br>ARMOND BUDISH<br>EARL LEIKEN<br>KENNETH MILLS<br>GEORGE TAYLOR<br>ERIC J. IVEY<br>DR. THOMAS TALLMAN<br>DANIEL HALLORAN<br>JESSICA TROVATO<br>ROB MARSH<br>GRACE LAGRECA<br>NURSE MURPHY<br>MAZO BEAWIN-MONAH<br>CHANDA ZITIELLO<br>BRIAN KLAK<br>CLASSIFICATION OFFICER STEELE<br>CLASSIFICATION OFFICER JOHNSON<br>AISHA PARNELL<br>(all in their individual and official capacities)) | CASE NO.:<br><br>JUDGE:<br><br>**COMPLAINT**<br><br>**(Jury Demand Endorsed Hereon<br>Along With Motion to Extend<br>Time In Which To File Affidavit<br>Of Merit Pursuant to Ohio Civil<br>Rule 10(D)(2)(b))** |

```
% THE CUYAHOGA COUNTY JAIL          )
1215 WEST 3RD STREET                )
CLEVELAND, OHIO, 44113              )
                                    )
and                                 )
                                    )
THE METROHEALTH SYSTEM              )
2500 Metrohealth Drive             )
Cleveland, Ohio  44109             )
                                    )
and                                 )
                                    )
JOHN AND JANE DOES 1-10            )
% THE CUYAHOGA COUNTY JAIL          )
1215 WEST 3RD STREET                )
CLEVELAND, OHIO, 44113              )
                                    )
          Defendants               )
```

## INTRODUCTION

1.      This civil rights action arises out of the preventable and tragic death of Brenden John Kiekisz, a 27-year-old man with serious mental health issues and a recent suicide attempt, both conditions of which Cuyahoga County was well aware.  As a direct and proximate result of the acts and omissions as set forth herein, Brenden suffered emotional distress, severe physical pain and suffering, and death.    Plaintiff Paula Kiekisz, Brenden Kiekisz's mother and the Administrator of the Estate of Brenden Kiekisz, seeks compensatory and punitive damages as well as reasonable attorneys' fees and the costs associated with this action.

## JURISDICTION AND VENUE

2.      The Jurisdiction of the Court is invoked pursuant to the Civil Rights Act, 42 U.S.C. § 1983 *et seq*; 42 U.S.C. § 12131 (the "Americans with Disabilities

2

Act"); the Judicial Code, §§ 1331 and 1343(a); §504 of the Rehabilitation Act of 1973 (§504); and the Constitution of the United States.

3.     Venue in this Court is proper as the parties reside, or at the time the events took place, resided in Cuyahoga County, and the events giving rise to the Plaintiff's claims also occurred in Cuyahoga County.

**PARTIES**

4.     Plaintiff Paula Kiekisz is, and was at all times relevant, a resident of the State of Ohio and Lorain County.   Paula Kiekisz is the duly appointed Administrator of the Estate of Brenden John Kiekisz.

5.     Decedent Brenden John Kiekisz ("Decedent") was at all times relevant to this Complaint a pretrial detainee in the custody and care of the Cuyahoga County Correctional Center/Jail ("CCCC").  At all times relevant to the allegations made in this Complaint, Decedent resided in the City of Cleveland, Cuyahoga County, Ohio.

6.     The Cuyahoga County Correctional Center ("CCCC") is the Cuyahoga County Jail, a correctional facility owned and operated by Cuyahoga County, with its principal place of business located at 1215 W. 3rd Street, Cleveland, Ohio, 44113.

7.     Defendant Cuyahoga County and/or the Cuyahoga County Board of Commissioners (collectively referred to hereinafter as "Defendant Cuyahoga County") is, and was at all times relevant, a political subdivision and unit of local government duly organized under the laws of the State of Ohio.  Defendant Cuyahoga County is a political subdivision/entity and is a "person" subject to

3

being sued pursuant to 42 U.S.C. §1983. Defendant Cuyahoga County is or was the employer and/or principal of the other named defendants.

8. Defendant Budish is the Cuyahoga County Executive. Defendant Budish is a "person" under 42 U.S.C. § 1983. At all times relevant to this case, Defendant Budish was responsible for the CCCC's operation, acted within the course and scope of his employment, and acted under the color of law. Defendant Budish was responsible for CCCC's policies, procedures, practices, customs as well as the training and supervision of agents, servants, and employees of the CCCC. Defendant Budish had policy making and/or final policy making authority for the CCCC and is sued in his individual and official capacity.

9. Defendant Leiken was the County Executive's chief of staff. Defendant Leiken is a "person" under 42 U.S.C. § 1983. At all times relevant to this case, Defendant Leiken was also responsible for the CCCC's operation, acted within the scope of his employment, and acted under the color of law. Defendant Leiken was also responsible for CCCC's policies, procedures, practices, customs as well as the training and supervision of agents, servants, and employees of the CCCC. Defendant Leiken had policy making and/or final policy making authority for the CCCC and is sued in his individual and official capacity.

10. Defendant Mills was the Director of the CCCC. Defendant Mills is a "person" under 42 U.S.C. § 1983. At all times relevant to this case, Defendant Mills was also responsible for the CCCC's operation, acted within the scope of his employment, and acted under the color of law. Defendant Mills was also responsible for CCCC's policies, procedures, practices, customs as well as the

training and supervision of agents, servants, and employees of the CCCC. Defendant Mills had policy making and/or final policy making authority for the CCCC and is sued in his individual and official capacity.

11.     Defendant Ivey was the Warden of the CCCC.  Defendant Ivey is a "person" under 42 U.S.C. § 1983.  At all times relevant to this case, Defendant Ivey was also responsible for the CCCC's operation, acted within the scope of his employment, and acted under the color of law.  Defendant Ivey was also responsible for CCCC's policies, procedures, practices, customs as well as the training and supervision of agents, servants, and employees of the CCCC. Defendant Ivey had policy making and/or final policy making authority for the CCCC and is sued in his individual and official capacity.

12.     Defendant Dr. Thomas Tallman was the Director of Correctional Medicine and/or the CCCC's Medical Director.  Defendant Dr. Tallman is a "person" under 42 U.S.C. § 1983.  At all times relevant to this case, Defendant Dr. Tallman was also responsible for the CCCC's operation, acted within the scope of his employment, and acted under the color of law.  Defendant Dr. Tallman was also responsible for CCCC's policies, procedures, practices, customs as well as the training and supervision of agents, servants, and employees of the CCCC. Defendant Dr. Tallman had policy making and/or final policy making authority for the CCCC and is sued in his individual and official capacity.

13.     Defendant MetroHealth System ("Defendant MetroHealth") was and is a political subdivision and unit of local government duly organized under the laws of the State of Ohio, and/or is a non-profit public health care system located in

5

Cleveland, Ohio, and is a "person" under 42 U.S.C. § 1983. Defendant Cuyahoga County contracts with MetroHealth to oversee and provide medical, nursing, and mental health services at the CCCC. Defendant MetroHealth operated at all times relevant herein under the color of law and was responsible for the policies, procedures, practices, customs as well as the training and supervision of agents, servants, and employees of the CCCC. Defendant MetroHealth, by and through its officers, employees and agents, had policy making and/or final policy making authority for the CCCC.

14.      Defendant Daniel Halloran was at all times relevant herein a corporal at the CCCC. Defendant Halloran is a "person" under 42 U.S.C. § 1983. At all times relevant to this case, Defendant Halloran was also responsible for the CCCC's operation, acted within the scope of his employment, and acted under the color of law. Defendant Halloran bore some responsibility for CCCC's policies, procedures, practices, customs as well as the training and supervision of agents, servants, and employees of the CCCC. Defendant Halloran had some policy making and/or final policy making authority for the CCCC and is sued in his individual and official capacity.

15.      Defendant Jessica Trovato was a nurse or other health care provider at the CCCC. Defendant Trovato is a "person" under 42 U.S.C. § 1983. At all times relevant to this case, Defendant Trovato acted within the scope of her employment and acted under the color of law. Defendant Trovato is sued in her individual and official capacity.

16. Defendant Rob Marsh was a Corrections Officer and/or Intake Officer at the CCCC. Defendant Marsh is a "person" under 42 U.S.C. § 1983. At all times relevant to this case, Defendant Marsh acted within the scope of his employment and acted under the color of law. Defendant Marsh is sued in his individual and official capacity.

17. Defendants Grace Lagreca, Defendant (Nurse) Murphy, Defendant (Nurse) Mazo, Defendant (Nurse) Chanda Zitiello, and Defendant (Nurse) Aisha Parnell were all nurses or other health care providers at the CCCC. These Defendants are each a "person" under 42 U.S.C. § 1983. At all times relevant to this case, these Defendants acted within the scope of their employment and acted under the color of law. These Defendants are each sued in their individual and official capacity.

18. Defendants Brian Klak, Defendant (Classification Officer) Steele, and Defendant Classification Officer) Johnson were all officers and employees of CCCC. These Defendants are each a "person" under 42 U.S.C. § 1983. At all times relevant to this case, these Defendants acted within the scope of their employment and acted under the color of law. These Defendants are each sued in their individual and official capacity.

19. John and Jane Does 1-10 are those individuals and entities whom, at all times relevant herein were employees, agents or acting on behalf of Defendant Cuyahoga County and/or Defendant MetroHealth or were acting under the supervision, agency and/or authority of Defendant Cuyahoga County and/or Defendant MetroHealth. These Defendants are each a "person" under 42 U.S.C. §

1983.  At all times relevant to this case, these Defendants acted within the scope of their employment and acted under the color of law.  These Defendants are each sued in their individual and official capacity.

## FACTS

### Christmas, 2018

20.     In September 2018, 26-year-old Brenden Kiekisz checked himself into Highland Springs, a mental health facility, because he was having suicidal thoughts, and he didn't want to die.

21.     While Brenden was receiving treatment at Highland Springs, he missed one appointment with his probation officer, and a warrant was issued for his arrest.[1]  Brenden was unaware of the warrant as he went back to reporting to his probation officer, and no violation was ever mentioned or addressed.  Brenden also understood that the Cuyahoga County Probation Department was aware that he had been admitted to Highland Springs.  Initially, therefore, Brenden did not appreciate his missing an appointment was a probation violation that could lead to his arrest.

22.     Upon realizing that a warrant had been issued for his arrest, Brenden became distraught.  He could not bear the thought of going back to the Cuyahoga County Jail.  As such, and in a state of despair, he overdosed.

23.     The overdose sent Brenden to the MetroHealth ICU for five days and was followed by a 14-day hospitalization at Ahuja Hospital.  When Brenden was discharged, he remained committed to staying off drugs and living clean.

---

[1] Brenden's limited criminal history doesn't include any crimes of violence; rather, his history lists crimes associated with a history of mental health issues and self-medicating with drugs.

24.    Brenden had another reason to clean up his life.  Brenden's girlfriend was pregnant, and the couple was going to have a baby.  Brenden's family saw in him a commitment to living drug free and a new optimism they had not seen in years.

25.    Brenden kept his promise to avoid drugs, but tragically, on December 23, 2018, Brenden Kiekisz learned that his girlfriend had a miscarriage.

26.    This unfortunate event was a difficult, emotional experience for everyone involved.  Ultimately, on Christmas Eve, December 24, 2018, Brenden argued with his girlfriend and found himself locked out of his home without shoes or a coat.

27.    Also on December 24, 2018, Brenden's father, Johnny Kiekisz, his mother, Paula Kiekisz, and his brother Brett, all drove from North Ridgeville, Ohio, to Cleveland to bring Brenden home for Christmas.

28.    When Brenden's family arrived in Cleveland, Brenden was obviously in a state of distress.  His family pleaded with him to come home with them for Christmas Eve dinner and for Christmas Day, but Brenden said he wouldn't leave his girlfriend, even if she was angry with him and had locked him out.

29.    Brenden's father Johnny, seeing that he was not going to be able to convince his son to come home with them, took off his own coat and shoes and gave them to Brenden.

30.    The family all hugged and wished Brenden a Merry Christmas.  They then got back into the family car, waved to Brenden, and drove off.

### Brenden Kiekisz's Christmas Day Arrest

31.     On Christmas Day, 2018, the Cleveland Police came upon a very distraught Brenden Kiekisz asking people for money so he could get something to eat.  Perhaps thinking they were doing him a favor, the police arrested Brenden for panhandling (aggravated solicitation).  As reflected in the records provided by Cuyahoga County, this charge was not recognized as an arrestable offense in December 2018.  Therefore, Brenden was taken into custody for an offense for which he never should have been arrested in the first place.

32.     However, once Brenden was transferred to Cuyahoga County the warrant for his missed probation meeting in September appeared on his record.  Despite the fact that Brenden Kiekisz wasn't supposed to have been arrested, and despite the fact that his probation violation was due to him being in a mental health facility for suicidal thoughts, which is an excusable reason for missing a meeting, Cuyahoga County kept Brenden Kiekisz in custody—putting him back in County Jail on Christmas Day.

### Brenden Kiekisz's Intake at the Cuyahoga County Jail
### A Tragedy of Errors

### Defendant Corrections Officer Rob Marsh

33.     Upon arriving at the Cuyahoga County Jail via the sallyport, Brenden Kiekisz was asked a series of questions by the booking officer, Corrections Officer Rob Marsh.

34.     C.O. Marsh has no medical or mental health experience, mental health training, or education in mental health issues.

10

35.     Marsh's questions are set forth on a form entitled "Pre-screening questionnaire."

36.     These questions consist of asking about a person's physical and mental health along with questions pertaining to whether or not they are on any medications.

37.     The very first question on the questionnaire was "Have you ever tried to kill yourself or done serious harm to yourself?" to which Brenden Kiekisz responded, "yes, I have - *two days ago*."

38.     When Marsh asked Kiekisz the second question on the form, "Do you currently have any ideas or thoughts about killing yourself or doing serious harm to yourself?" Brenden apparently responded, "No."

39.     Critically, the form and Brenden's answers put Cuyahoga County on notice that Brenden had mental health issues.  The form asked, "Do you have any serious medical or mental problems?" and Brenden responded that he suffers from Depression and Bipolar Disorder.

40.     The questionnaire also put Cuyahoga County on notice that Brenden was currently taking serious prescription medication for his mental health issues, namely Cymbalta, Depakote, Wellbutrin, and Atarax.

41.     Marsh noted on the form that Brenden seemed "angry."   More importantly, Marsh noted that Brenden had recently carved the letters "F.U." into his left arm.

42.     The questionnaire repeats certain questions in an attempt to obtain truthful and accurate answers for critical mental health issues.  In this instance, Brenden

was again asked about key health matters to which he again responded that he was currently taking "Cymbalta, Depakote, Wellbutrin, and Atarax," that he suffers from Depression and Bipolar Disorder, **and that he tried to kill himself two days ago**.

43.     Despite all of these obvious warning signs that Brenden was suffering from a mental health emergency, all of this evidence was completely ignored.

44.     Following Brenden's death, and as part of the Ohio Attorney General's criminal investigation into the death of Brenden Kiekisz, C.O. Marsh was interviewed by Cuyahoga County Detective Goudy and Sergeant Bartczak.

45.     During his video and audio recorded interview, C.O. Marsh indicated that he books everyone into the jail unless they are "intoxicated or bleeding."

46.     As such, when he booked Brenden Kiekisz, neither Brenden's recent suicide attempt, his mental health diagnoses, nor his medications kept him from being processed in the same way any other inmate would be booked.

47.     C.O. Marsh did confirm, however, that Brenden's Depression and Bipolar disorder had been diagnosed by a physician.

48.     C.O. Marsh also explained that the Cleveland Police who picked up Brenden were aware that the "panhandling" charge they arrested him for was no longer a valid arrestable offense but that the pending probation violation warrant was enough to keep him at the jail.

49.     The Detectives investigating Brenden's death also asked C.O. Marsh if he knew the method Brenden used to try to kill himself two days prior to being booked into the County Jail.  C.O. Marsh responded that he didn't know how

Brenden had tried to kill himself but that it could be from the "F.U." Brenden had carved into his arm or evidenced by "*the dried blood on his* [Brenden's] *pants.*"

50.     The Detectives then asked C.O. Marsh about Cuyahoga County's policies and procedures relative to inmates who respond that they have recently attempted suicide as well as those who are actively contemplating suicide.

51.     Marsh explained that if someone responds that they are actively suicidal, then whoever is "in booking" would notify mental health.

52.     When asked the policy and procedure for someone who indicated that they were recently suicidal, C.O.  Marsh said he didn't know Cuyahoga County's policy or procedure.  C.O. Marsh was unaware if Cuyahoga County even had such a policy or procedure.  .

53.     C.O. Marsh further responded that if someone has a history of suicide, even if it was only two days ago, he would leave that decision up to his supervisor.  The supervisor could contact mental health or not.

54.     Thus, when C.O. Marsh encountered Brenden Kiekisz on December 25, 2018, C.O. Marsh was aware that Brenden:

      a.   Suffered from Depression;

      b.   Suffered from Bipolar Disorder;

      c.   Was taking Cymbalta, Depakote, Wellbutrin, and Atarax—all as prescribed by a doctor;

      d.   Attempted suicide just two days prior;

      e.   Appeared "angry;"

      f.   Had carved the letters "F.U." into his forearm; and

      g.   Had dried blood on his pants which C.O. Marsh assumed may have

been related to Brenden's suicide attempt two days prior.

Considering all these objectively glaring facts which should have alerted C.O. Marsh to the fact that Brenden Kiekisz needed mental health intervention, C.O. Marsh didn't alert any of the mental health professionals in the Cuyahoga County Jail. Marsh repeated that there is "no protocol" and "I don't know that there is a protocol" for situations such as this.

55.    Rather, C.O. Marsh called his supervisor, Corporal Daniel Halloran, and informed him of Brenden Kiekisz's recent suicide attempt and other information.

56.    According to C.O. Marsh, Cpl. Halloran's response was "Get him dressed, and we'll have him seen."

57.    By this point, Brenden had been given a "floor card." A floor card is a one-page form that includes information about the inmate. Critically, it includes where the inmate is housed and their status and/or "classification." Floor cards are of critical importance in keeping track of inmates and are used to insure that inmates with medical and mental health needs are placed in the correct area or "pods."

58.    Inexplicably, but presumably based on Cpl. Halloran's alleged recommendation, C.O. Marsh sent Brenden into the jail's general population instead of sending him for a mental health referral/evaluation or to a mental health pod. Specifically, C.O. Marsh wrote "7 H" on Brenden's floor card, which resulted in Brenden being sent to a general population dorm pod where he wasn't going to get any sort of medical attention or mental health intervention.

59.    Earlier in 2018, C.O. Marsh had been a floor Corrections Officer at the CCCC.    On July 16, 2018, however, C.O. Marsh was relieved of his guard duties after he brutally and intentionally beat CCCC inmate Chanelle Glass while she was tied down in a restraint chair.    C.O. Marsh was ultimately terminated and criminally prosecuted for his abuse of Ms. Glass.    However, CCCC's initial decision was to transfer C.O. Marsh to inmate intake to perform health assessments.    Accordingly, it should have come as a surprise to no one that C.O. Marsh, with zero training or experience performing inmate intake assessments, treated Brenden Kiekisz with a similar disregard for human decency.

60.    The video of C.O. Marsh's interview can be viewed at the following link:

https://drive.google.com/drive/folders/1XG7hKhT4lg2X4SWxTDshyYBYNZYgkIqZ?usp=sharing

## Defendant Corrections Corporal Daniel Halloran

61.    Corporal Halloran's recollection of his conversation with C.O. Marsh is not consistent with C.O. Marsh's account.

62.    According to Cpl. Halloran, when C.O. Marsh told him that Brenden Kiekisz had a recent suicide attempt, Cpl. Halloran offered to come down and escort Brenden to a mental health evaluation.    C.O Marsh held him off. According to Halloran, Marsh responded with "It's going to be a while. I'll give you a call."    Therefore, Cpl. Halloran didn't go get Brenden Kiekisz for his mental health evaluation because C.O. Marsh was going to call Cpl. Halloran back when Brenden was ready.

63.    As such, Cpl. Halloran essentially told the Detectives investigating Brenden's death that it was C.O. Marsh's fault for never calling him back. Cpl.

15

Marsh's perspective is that because C.O. Marsh never called him back, he never needed to check on Brenden Kiekisz, an inmate with mental health diagnoses who required mental health medications, and who recently tried to kill himself.

64.    According to Cpl. Halloran, and in accordance with the "mental checklist" of things he needed to do, Halloran went to the mental health office at the jail to let them know that there was an inmate with mental health needs and a recent suicide attempt who was going to be admitted. As of the filing of this Complaint, no document or other evidence has been produced that Cpl. Halloran gave anyone in the CCCC mental health department a heads-up that there was an inmate with a recent suicide attempt in need of mental health services.

65.    For well over an hour, Cpl. Halloran repeatedly explained to the Cuyahoga County investigators that he approached Defendant Nurse Grace LaGreca and gave her a 'heads up' about the mental health inmate with the recent suicide attempt now known to be Brenden Kiekisz.

66.    There are several serious problems with Cpl. Halloran's testimony.

67.    First, despite repeatedly informing the Detectives investigating Brenden's death on behalf of the Ohio Attorney General's Office that he specifically gave Nurse LaGreca the 'heads up' about Brenden Kiekisz, and even going so far as to describe what she was wearing when he gave her the 'heads up', Nurse LaGreca was not even working that night, at least not according to the roster and the statements of the investigating Detectives.

68.    When confronted with a December 25, 2018, video of himself speaking with Defendant Nurse Jessica Trovato, Cpl. Halloran stated that he must have

been mistaken.  Cpl. Halloran now stated that he informed Nurse Trovato about Brenden Kiekisz's situation and that Brenden needed to be seen by mental health nurses.  The video in question has no accompanying audio.

69.     According to Cpl. Halloran, when he told Nurse Trovato about the need to have Brenden seen for a mental health assessment, she told him that she "already knows about it, he's (Brenden) being registered in E.P.I.C., he'll get an assessment, and they'll bring him up."

70.     E.P.I.C. is the Cuyahoga County Jail's health reporting system, and if Brenden was entered into E.P.I.C., it would mean that he had or was going to get a mental health assessment.

71.     This account, however, leads to the second serious problem with Cpl. Halloran's statements to the investigators.  *Nurse Trovato denies Cpl. Halloran ever brought to her attention this inmate with a recent suicide attempt and who was in a mental health crisis.*

72.     Finally, Cpl. Halloran's statements are belied by the fact that none of this information (his conversation with C.O. Marsh, his conversation with Nurse Trovato, and his 'following-up' relative to Brenden Kiekisz) are reflected anywhere in his logs, nor, upon information and belief, in the personal notes which he referenced during the course of the criminal investigation into Brenden's death.

73.     Cpl. Halloran was, however, more certain and specific in his statements relative to the policies and practices of the Cuyahoga County Jail.  Cpl. Halloran explained that there is **no written policy** regarding what to do with an inmate who

17

has a history of suicide but is not "actively suicidal" (actively meaning being suicidal at the very moment of being questioned regarding suicidal ideation). Despite the fact that it's the **first question** on the pre-screening questionnaire, apparently no one at the CCCC knew or knows what to do with this critical piece of mental health information.  Cpl. Halloran specifically stated, "**As far as I know, there's nothing specifically written for how to handle this.**"

74.     Indeed, the Union Steward sitting next to Cpl. Halloran during the course of his interview volunteered, "It's kind of random," when discussing how to deal with someone with a history of prior suicide attempts.

75.     Cpl. Halloran conceded more than once, however, that an indication of a prior suicide should have triggered a mental health assessment.

76.     Cpl. Halloran also repeatedly stated that the jail was short staffed, is chronically understaffed, and that there were not adequate personnel to run the jail.

77.     In addition to expressing his frustration and dismay with the lack of staff and resources in the Cuyahoga County Jail, Cpl. Halloran made a series of additional admissions:

    -     Cpl. Halloran admitted that Brenden Kiekisz should have been sent to mental health based on his recent suicide attempt.

    -     Cpl. Halloran admitted that he doesn't know the Jail's policies or procedures relative to booking inmates with mental health issues despite the fact that he's a jail supervisor.

    -     Cpl. Halloran admitted that the Cuyahoga County Jail revised its intake and booking procedure after Brenden Kiekisz's death.  Indeed, the County's *original* policy/procedure regarding inmate assessments at intake included having a nurse in the sallyport/booking area to conduct health evaluations.  This important and effective policy was apparently changed

under Budish/Mills/Ivey.  The system Brenden Kiekisz faced didn't include a nurse to help with intake; rather, it meant that an untrained, inexperienced Corrections Officer like C.O. Marsh would be performing the intakes alone, with no training.  C.O. Marsh clearly didn't know what to do with Brenden or his emergency, nor did he apparently know why he was asking Brenden any of the pre-screening questions included on the form.  After Brenden's death, CCCC went back to the original policy/procedure of assigning a nurse to conduct inmate assessments at intake.

- Cpl. Halloran admitted that Brenden should have stayed in the sallyport holding area until he could be sent to the mental health pod.

- Cpl. Halloran admitted that Brenden should not have been sent to 7E or 7 H, general population dorm pods where Brenden wasn't going to get the medical attention he needed.

- Cpl. Halloran admitted, when asked about Brenden being sent to 7H, that it was "**not proper procedure.**"

- Cpl. Halloran admitted that in his experience, when dealing with inmates who are suicidal, they should be put on suicide precautions which include a suicide blanket and put on a suicide watch.

- Cpl. Halloran admitted that jail staff could potentially have learned about Brenden's issues via the E.P.I.C. computer system and followed-up accordingly, but they were not permitted on the E.P.I.C. system because it involved sharing health information with non-medical personnel.  Cpl. Halloran did not explain how C.O. Marsh's obtaining and publishing Brenden's health information (e.g., his diagnoses of Depression and Bipolar disorder, his medications, etc.) was not an improper sharing of private health information.

- Cpl. Halloran admitted that the Cuyahoga County Jail was "*Really low on supervision that night (Christmas).  [The Jail] was way below minimum for the whole facility.*"

- Finally, Cpl. Halloran admitted that none of the information he is relying upon in explaining what occurred to Brenden is reflected in his log.  He stated, "**We all make mistakes...I could have done a better job.**"

Cpl. Halloran's video interview can be viewed at the following link:

https://drive.google.com/drive/folders/1EHjqc9O3gsvLmtgMMx9Ia7oCtCJVG2L9?usp=sharing

**Defendant Nurse Jessica Trovato**

78.     Contrary to Cpl. Halloran's statements that he told Nurse Trovato about Brenden Kiekisz needing an assessment, Nurse Trovato does not recall any such conversation.  She specifically denied having a conversation about Brenden because she would have remembered his peculiar name and how he looked. Nurse Trovato did not make any statements about being advised of an inmate with a recent suicide attempt, the letters "F.U." recently carved into his forearm, nor the dried blood on his pants.

79.     Nurse Trovato emphasized her professionalism during the course of her interview with the Detectives but subsequently left open the possibility that perhaps she was, in fact, asked to perform an assessment of Brenden Kiekisz and failed to do so.

80.     Cpl. Halloran told investigators that Nurse Trovato insisted that inmates be registered into E.P.I.C before they could be assessed.  Nurse Trovato testified that while it was preferable to have an inmate registered before they were assessed, she would never allow an unregistered inmate to not be assessed.

81.     It was only after Nurse Trovato explained to the Detectives that a presumed malfunction in her computer at the Cuyahoga County Jail was preventing her from logging on to E.P.I.C. and/or to entering assessments that she became defensive.

82.     Indeed, during the course of her interview with Detectives, Nurse Trovato vacillated between insisting that she was never informed that Brenden Kiekisz needed a mental health assessment and admitting that her computer issues and

workload may have resulted in her not performing the assessment Brenden Kiekisz desperately needed.

83.     Nurse Trovato also told the Detectives that she had personal notes regarding her work at the Cuyahoga County Jail and that she kept these notes in her bookbag, which was in her car. After Cuyahoga County Sheriff's Department Sgt. Bartczak asked if they could accompany Nurse Trovato to her vehicle to review these notes, Nurse Trovato suddenly changed her statement to one of uncertainty as to whether her notes would be in her car. Worse yet, Nurse Trovato then went so far as to tell the Detectives that she had shredded her personal notes because she had entered everything into the E.P.I.C. system on her work computer.

84.     Nurse Trovato admitted however that if Brenden Kiekisz stated that he had attempted suicide in the past two days that such information would have triggered a mental health assessment and that Brenden would have been put on suicide precautions including but not limited to being placed in the mental health pod, being given a suicide-preventative blanket, and placed in a cell with measures to reduce the risk of self-harm.

85.     Nurse Trovato's interview with law enforcement was video/audio recorded. Importantly at 4:52:30 of her interview Nurse Trovato also stated that it was only during her most recent meeting with Charge Nurse Aisha Parnell (post-Brenden Kiekisz's death) that Charge Nurse Aisha Parnell gave the order to put anyone with prior suicide attempts on full precautions. That is to say, and as further evidence of the confusion and unconstitutional policies, procedures,

customs, and practices of the CCCC in place prior to Brenden's death, an inmate in crisis such as Brenden Kiekisz may not have been put on suicide precautions despite the objectively obvious need for treatment and intervention.

86.     Nurse Trovato was asked a significant number of questions regarding Brenden Kiekisz's floor card.  Specifically, she was asked about the large, red stamp that stated "MEDICAL" on the outside cover of Brenden's floor card. Contrary to what might be one's initial impression, the large, red "MEDICAL" stamp on an inmate's floor card does not reflect a need for the inmate to obtain medical attention or a medical assessment.  Rather, the large, red "MEDICAL " stamp indicates that the inmate has had their medical assessment and has been cleared by medical.  Essentially, the stamp tells everyone that the inmate is mentally and physically fine.  As such, Brenden's floor card indicated that Brenden was medically assessed and cleared to be in the general population. Rather than simply reflecting the failure of the CCCC staff to recognize that Brenden was desperately in need of emergency mental health intervention, the red "MEDICAL" stamp on his folder was an indication that Brenden had been given a health assessment and was essentially cleared.  Worse than simply failing to assess or treat Brenden, someone had taken the horrific step of actually stamping Brenden's floor card to inaccurately reflect that Brenden was someone who, a.) had been given a mental health assessment; and b.) was not in a crisis and didn't need any mental health treatment or intervention.  This large, red "MEDICAL" stamp on Brenden's folder belied the fact that Brenden had never actually been given an assessment.

87.     Nurse Trovato suggested that possibly the nurse in the shift before hers incorrectly stamped Brenden's floor card, either Nurse Murphy or Nurse Mazo. But when it was pointed out that the card couldn't have been stamped before she was on shift, Nurse Trovato stated that she didn't know how it got stamped, but that **"Obviously somebody dropped the ball," and "Somebody's in big trouble."**

88.     Nurse Trovato also referenced the possibility that a C.O. may have used the "MEDICAL" stamp which improperly resulted in Brenden being placed in the jail's general population instead of having an assessment and getting the psychiatric care he most certainly needed.   Nurse Trovato had no proof or evidence to support this suggestion.   Ultimately, and despite Nurse Trovato being the only psych LPN on shift, she denied stamping Brenden's floor card.

89.     Nurse Trovato's video interview can be viewed at the following link:

https://drive.google.com/drive/folders/1QCtMwY-AQubuZlYgfBrRcf3ng_QR4LDV?usp=sharing

### Nurse Estrella Aquino

90.     Nurse Estrella Aquino was the most candid and credible of any of the witnesses interviewed by the law enforcement officers investigating the death of Brenden Kiekisz.

91.     During the course of her interview, Nurse Aquino clearly explained the booking process and how assessments are supposed to be completed.

92.     Nurse Aquino agreed that floor cards are not to be stamped "MEDICAL" until after, and only after, the inmate has had a health assessment and has been cleared for a general population pod.

93. However, during her January 8, 2018, interview with the investigators, Nurse Aquino told Sgt. Bartczak and Detective Goudy that "*within the past 3-4 weeks,*" Corrections Officers are not paying attention to floor cards and that the cards are "*piling up.*"

94. Nurse Aquino stated that Classification Officers Steel, Klak, and Johnson told her (and other nurses) that from their perspectives, if an inmate has been in the jail for 3-4 days, then someone in medical should have already performed an intake assessment on the inmate, and therefore, the C.O.'s get to make the decision to move them into the general population.

95. Sgt. Bartczak asked Nurse Aquino how the C.O.'s could move inmates from the intake pods to general population pods before they have had their intake assessments and Nurse Aquino stated that **they just do it without asking.**

96. In what can only be described as incredible and courageous testimony, Nurse Aquino explained that ever since the U.S. Marshals performed their analysis of the Cuyahoga County Jail, wherein they found overcrowding and inmates sleeping in hallways and other places on the floor, that Cuyahoga County was put under pressure to move the inmates out of intake pods more quickly. This meant clearing them out of 7E and 7H intake pods as fast as possible. So rather than wait for all of these inmates to have their intake assessments performed, the backlog of which was due in part to a lack of adequate medical staff to perform these assessments, **the C.O.s are simply taking the inmates to general population pods without any regard for an assessment.**

24

97.     When Sgt. Bartczak asked Nurse Aquino if the C.O.s are allowed to simply take an inmate who hasn't been assessed and place the inmate in a general population pod despite the inmate's potential need for medical attention and/or mental health services, Nurse Aquino stated "I don't think so. They never ask." Essentially, Nurse Aquino is describing how the Cuyahoga County Jail traded one unconstitutional policy, custom, or practice for a different unconstitutional policy, custom, or practice.

98.     In response to this incomprehensible "tug of war" between a depleted medical staff and C.O.'s who are being pressured to move inmates regardless of the inmate's medical and mental health needs, Nurse Aquino explained that she will take floor cards and go into the hallways of the jail calling out the names of inmates who have not yet had their assessments performed. She will then perform assessments and assign the inmate to an appropriate pod. She has been forced to confront C.O.s, telling them *"They haven't had their assessment yet, you can't take them*!". The C.O.s apparently listen to Nurse Aquino and go along with her insistence, but "they don't like it."

99.     Also according to Nurse Aquino, this policy, custom, and/or practice is well-known and widespread throughout the CCCC.

100.    Sgt. Bartczak wisely asked Nurse Aquino, "But if you don't get to them before they (the C.O.s) move the inmate...?" Nurse Aquino merely shrugged.

101.    Nurse Aquino also admitted to instructing various C.O.s to stamp floor cards with the "MEDICAL" stamp, although only **after** she completed an assessment.

102.    Perhaps just as important, Nurse Aquino explained that Cuyahoga County Jail nurses are supposed to enter inmate assessments onto IMAX, the inmate information system accessible to jail staff, including corrections officers.  As reflected in her video interview, when Sgt. Bartczak asks Nurse Aquino if the jail nurses actually enter this critical information into IMAX so that jail staff can see the status of a particular inmate, **she laughed and said "No."**  The Cuyahoga County Jail nurses are supposed to enter this information into the IMAX system but their policy, custom, and practice is that they simply don't.

103.    In response to being asked why don't the nurses enter this information into IMAX, Nurse Aquino authoritatively stated **"Poor training."**

104.    Nurse Aquino then described how, over the previous 7-10 days, the floor card situation had become chaotic.  She explained that she found 8-9 floor cards which were stamped "MEDICAL," despite the fact that two of the cards were for inmates who had not yet had their assessment, and the rest were no longer in jail. Nurse Aquino also stated that she and Nurse Stipek find floor cards, sometimes in the "completed" basket, despite the fact that they aren't completed.

105.    When asked if she told her supervisor about this dangerous, unacceptable, and pervasive situation, Nurse Aquino explained that she doesn't truly know who her supervisor is.  She explained that Cuyahoga County never hired a replacement Director of Nursing, and that no one ever explained the chain of command to Nurse Aquino.

106.    Nurse Aquino did, however, state that she and Nurse Stipek had informed Nurse Purnel and Jail Medical Director, Dr. Tallman, about the situation.

107.    Nurse Aquino also told Charge Nurse Chanda Zitiello about the floor cards and the inmates being moved into the general population without being assessed, but according to Nurse Aquino, Nurse Chanda Zitiello has yet to do anything about it.

108.    Nurse Aquino credibly testified relative to the lack of leadership and corrective action as follows: *"There's a lot of that here.  A lot of broken processes.  A lot of no follow through.  It is very difficult.  Everything is word of mouth.  You know like our training is word of mouth.  There's no policies or procedures.  They're outdated."*

109.    Nurse Aquillo's video interview can be viewed at the following link:

https://drive.google.com/drive/folders/1e2l3854BrM4bzzvfeY4hMPwUu2cHQeGc?usp=sharing

### Brenden Kiekisz Appears in the Cuyahoga County Court

110.    Brenden went without adequate medical attention at the Cuyahoga County Jail, despite the fact that he truthfully explained to jail staff that he suffered from Depression and Bipolar Disorder.

111.    Brenden was also denied his medication, despite the fact that he informed jail staff that he was taking prescription Cymbalta, Depakote, Wellbutrin, and Atarax.

112.    CCCC's failure to address Brenden's obvious need for medical and mental health treatment was made worse by jail staff inaccurately indicating that Brenden had been subject to a health assessment and that he was cleared.

113.    On the morning of December 27, 2018, Brenden Kiekisz appeared in the Cuyahoga County Court of Common Pleas for his alleged probation violation.

Brenden explained to the Court that he admitted himself to Highland Springs because he was having suicidal thoughts.  Brenden further explained that he overdosed and was admitted to the hospital for treatment after he realized he had missed a probation appointment.

114.    His attorney, Craig Smotzer, made the following statement on Brenden's behalf:

*Thank you, your Honor, may it please the Court.  That pretty much sums up what brings him here before you today.  He has been suffering, and it sounds like from not only drug addiction, but from mental health issues.  He's been diagnosed with PTSD, but we believe there's some depression—pretty severe depression and anxiety which led him to self-harm behavior.  So he took himself to the hospital because he was having suicidal thoughts.  He then missed his report date.  He got out, and then with no support and the fear of just ending up in the county jail, he asks for no further help, ends up overdosing on what he believed to be heroin but was most likely Fentanyl.*

(See, Transcripts of Proceedings, attached hereto as Exhibit 1)

115.    Brenden expressly told the Court that he needed to go back to Highland Springs and that he was feeling "really messed up" without his medications and psychiatric care.

THE COURT:          Highland Springs.  Do you have insurance to pay for it?

THE DEFENDANT: It's United HealthCare through Medicaid.  I'm feeling really messed up about my medications right now.  It's been two days since I took them.

THE COURT:          You haven't been seen by the psychiatric unit?

28

THE DEFENDANT: No, I don't even think they give me my medications here.

THE COURT: They don't?

THE DEFENDANT: This is the place that causes the depression. I'm losing it in here.

\* \* \*

THE DEFENDANT: All right. And I don't know how you would feel about this, but if I was able to get out and continue my IOP, if I ever end up in this courtroom again, you can max me out. I'll make sure I never end up in here again.

\* \* \*

THE DEFENDANT: Because this place isn't helping me. And if I can get out of here today, I could be in Highland Springs by myself tomorrow. They'll take me right in there.

116. Brenden Kiekisz left court that morning and was taken back to his cell in the general population 8F pod. He waited for one of the Sheriff's deputies or a Corrections Officer to come and get him, to send him to Highland Springs. Brenden was alone but was given a blanket. And so he waited.

117. Just before 11:00 p.m. on December 27, 2018, Corrections Officer Walsh looked into Brenden's cell and noticed him laying almost prone. Brenden did not appear to be moving. C.O. Walsh eventually alerted jail staff who responded to the emergency. Brenden had tied his blanket to the handle of the bunk bed and hung himself.

118. After receiving a notification visit in the middle of the night from the Cuyahoga County Sheriff's Department, Brenden's family went to MetroHealth Hospital in Cleveland, Ohio.

119.    For almost three days Brenden's family suffered through a horror no parent should have to endure.  Brenden remained attached to machines that were keeping him alive in the hopes that he would somehow pull through this trauma.

120.    Brenden lingered on life-support until he died on December 30, 2018, at the age of 27.  The Cuyahoga County Sheriff's Deputies left a bag of Brenden's belongings on the Kiekisz's front porch which included the shoes and coat his father Johnny had given him on Christmas Eve.

### Defendant Warden Eric Ivey

121.    Defendant and former CCCC Warden Eric Ivey was also interviewed by law enforcement relative to the policies, practices, abuses and deaths within the Cuyahoga County Jail.

122.    During Warden Ivey's March 22, 2019 interview, Ivey was asked about the disturbing number of recent deaths within the County Jail.  Regarding the death of Brenden Kiekisz, Warden Ivey stated in relevant part at 1:39:12 of his recorded interview:

> There were [deaths] *that could have been avoided.*  [The] *December one, hey I tried to commit suicide two days ago.  Things should have happened. The Jail should have owned it.  The Jail owns that one.*

123.    Defendant Warden Ivey 's comments that the jail "owns that one" is, thus far, the highest ranking CCCC official to acknowledge the complete breakdown of a system meant to insure inmate safety and the failure of which cost Brenden Kiekisz his life.

### Evidence of Unconstitutional Customs, Policies, and Practices
### at the Cuyahoga County Jail

124.   Prior to Brenden Kiekisz's death, the U.S. Department of Justice, by and through the U.S. Marshals Office, conducted a thorough investigation and audit of the Cuyahoga County Jail.

125.   The final report of the U.S. Marshals' investigation, set forth herein through a link at paragraph 156 of Plaintiff's Complaint and fully incorporated herein, set forth various findings.   Some, of those findings relative to the Cuyahoga County Jail included:

- Cuyahoga County Jail staff failed to complete intake screenings in a timely manner;

- Jail staff failed to report on health, safety, and security measures;

- Jail staff and inmates feared repercussions for speaking candidly to the U.S. Marshals investigators and U.S. Department of Justice agents;

- Comprehensive mental health appraisals were not conducted in a timely manner;

- There existed a backlog of "Kites" (requests by inmates for medical and/or mental health care);

- No information regarding the six (6) inmate deaths reported to the U.S. Marshals was maintained by the Warden's Office;

- The Cuyahoga County Jail's staff training curriculum does not consist of policy review and identifying and reporting signs of detainee/inmate mental health decomposition; and

- The denial of food, toilet paper and other essential items was used as a punitive measure against inmates.  Inmates were told to use their clothing for toilet paper.  Food was often withheld from prisoners, and they were not provided other basic staples like pens and paper.

126.   Prior to Brenden Kiekisz's death, the U.S. Department of Justice, by and through the U.S. Marshals Office, conducted a thorough investigation and audit of the Cuyahoga County Jail.

127.   Even more significantly, the U.S. Marshals team discovered the following

> "SRT members who were escorting detainee/inmates to be interviewed by Facility Review Team members were referring to requested detainee/inmates as "Snitches," as they escorted them to and from the interview location. The threatening, intimidating, and aggressive behavior demonstrated and witnessed by the Facility Review Team resulted in the request to remove up to 10 detainee/inmates from the CCCC, for fear of SRT members retaliation, and the legitimate fear of detainee/inmate safety."

128.   It is significant and shocking that the Cuyahoga County Corrections Officers would intimidate witnesses who were part of a U.S. Department of Justice/U.S. Marshals' investigation.   Yet, it is almost incomprehensible that the Cuyahoga County Jail's staff were so brazen as to intimidate witnesses in front of and within earshot of these federal investigators.

129.   The same culture and perverse environment that would allow witness intimidation in front of the U.S. Marshals investigators is the same culture and environment that emboldened these Defendants to ignore Brenden Kiekisz's medical emergency, and worse yet, to respond to his need for critical care.

130.   Further evidence of unconstitutional customs, policies, and/or practices within the Cuyahoga County Jail include those facts which form the basis for charging former Cuyahoga County Jail Warden Eric Ivey with felony charges for tampering with records and falsification.

32

131.    Defendant Warden Ivey ordered Cuyahoga County Corrections Officers to turn off their body cameras.  Ivey's actions, made in his official capacity and as a policy maker for Cuyahoga County, created an environment of corruption, neglect, and abuse.  By instituting such an offensive policy (eliminating the evidence of inmate abuse, neglect, and other criminal acts), Ivey all but guaranteed violations of the Constitution such as those suffered by Brenden Kiekisz.

132.    In addition to the failings detailed in the U.S. Marshals Report, the unconstitutional policies, customs, and practices of the Cuyahoga County Jail are evidenced by the copious number of shocking incidents, some of which are set forth as follows:

-    **Nicholas Colbert**

National Guard Veteran Nicholas Colbert was admitted to the Cuyahoga County Jail following a lower level drug possession case.  Nicholas battled drug addiction and had repeatedly committed time and effort to getting sober.  Upon his admission to the Cuyahoga County Jail, his family was actually relieved because they believed he would be safe, off the streets, and not in harm's way.  The Cuyahoga County Jail failed to perform a proper intake for Nicholas Colbert.  They failed to provide him with an adequate screening and mental health evaluation.  Just a few short hours after Nicholas Colbert was moved into a cell in a pod for Veterans, he hanged himself.  Nicholas's death inexcusably occurred *after* the Cuyahoga County Jail officials had been given the scathing review and analysis from the U.S. Marshals relative to the

substandard conditions at the Cuyahoga County Jail. Indeed, many of the exact same problems which were occurring in the Cuyahoga County jail, e.g., lack of training, lack of medical screening, an absence of mental health screening, a lack of suicide precautions and preventative measures, were those addressed by the U.S. Marshals. Similar to Mr. Kiekisz, Nicholas Colbert's health conditions and medical needs were ignored and/or willfully disregarded. Nicholas Colbert also left behind a loving family.

- **Esteben Parra**

On June 23, 2018, Esteban Parra, a 32-year old son, brother, and father of two children, died while in the care and custody of Cuyahoga County. Esteben was experiencing drug toxicity and repeatedly asked for medical help. Esteben was objectively in a medical crisis and was wilfully ignored by officers, nurses, and doctors as his crisis mounted, and his suffering increased. Instead of treating his life-threatening condition, jail staff strapped Esteben to a restraint chair in a cruel gesture of disregard. Despite repeated grievances, obvious warnings, and a well-known history of abuse and horrible conditions within the Cuyahoga County jail, Esteben Parra senselessly lost his life. Cuyahoga County bears responsibility for the lack of medical attention required by law as well as the respect and human decency that Esteban deserved and should have received.

- **Joseph Arquillo**

On August 27, 2018, Mr. Arquillo was an inmate at the Cuyahoga County Corrections Center. Mr. Arguillo suffered a medical emergency while in the

care and custody of Cuyahoga County. However, rather than provide Mr. Arquillo emergency medical assistance, a corrections officer came up to a prone Mr. Arquillo, kicked the mat he was lying on, and walked away. Other inmates called Mr. Arquillo's condition to the attention of other Cuyahoga County Jail staff, and their pleas were ignored. Mr. Arquillo died in the Cuyahoga County Jail.

- **Gregory Fox**

Gregory Fox, a 36-year-old man, was a pretrial detainee at the Cuyahoga County Jail in August 2018. Jail employees failed to provide Mr. Fox with necessary mental health care and medication and failed to take necessary steps to prevent his suicide. As a result, Mr. Fox committed suicide in his cell.

- **Ms. Chantelle Glass**

Ms. Glass was taken into the Cuyahoga County Jail based on an old misdemeanor warrant out of New Jersey. Ms. Glass requested to call her family so they could find a lawyer to resolve this issue. The jail staff refused. In retaliation for repeatedly requesting to use the phone, Ms. Glass was assaulted and forced into a restraint chair, despite the fact that she was being compliant. Thereafter, Ms. Glass was violently struck and had an entire can of pepper spray emptied into her face, all while Ms. Glass was restrained. When Ms. Glass asked why she was maced, C.O. Clark responded, "Because you talk too much." Similar to Brenden Kiekisz, following Ms. Glass's unlawful abuse, she was denied adequate medical care and was forced to remain strapped helplessly to the restraint chair.

- **Mr. Joshua Castleberry**

Mr. Castleberry snuck an extra bologna sandwich from the commissary with the intention of eating it in his cell.  When he was caught, Mr. Castleberry threw the bologna sandwich at the corrections staff.  In response, Corrections Officers John Wilson and Jason Jozwiak handcuffed Mr. Castleberry then savagely "smashed Mr. Castleberry's face so violently into the ground that his front teeth came out of his nose.  They placed him in a restraint chair and jammed a mask over his broken face to conceal their assault from medical staff."  Similar to Brenden Kiekisz, Mr. Castleberry was unlawfully abused and subsequently denied adequate medical care.

- **Mr. Tyrone Hipps, Jr.**

On November 1, 2018, Mr. Hipps, a Muslim inmate in the Cuyahoga County Jail, was interviewed by the U.S. Marshals Service Quality Assurance Review Team regarding the conditions in the Cuyahoga County Jail.  Mr. Hipps provided information regarding the abuses and inhumane conditions inside the jail.  Two days later, a Special Response Team (SRT) member, Officer Perdue, refused to let Mr. Hipps pray in an area and in a fashion where he had previously been allowed.  In direct retaliation for providing information to the U.S. Marshals investigators, and in violation of Mr. Hipps' First and Fourteenth Amendment rights, Officer Perdue put Mr. Hipps in a chokehold and slammed him headfirst into the ground.  Officer Perdue also altered his bodycam so as to prevent his abuse from being recordedMr. Hipps was further

retaliated against by being placed in solitary confinement ("the hole"), and similar to Brenden Kiekisz, was also denied medical care.

- **Mr. Corrione Lawrence**

During the course of being processed into the Cuyahoga County Jail, Mr. Lawrence responded to questions in Spanish. The booking officer and other jail staff decided that Mr. Lawrence was simply being difficult by responding in Spanish, so as punishment, they placed him in the restraint chair. Mr. Lawrence was strapped down to a chair and forced to sit in a freezing cold room for approximately four (4) hours as punishment. Thereafter, Mr. Lawrence was placed in a pod with his cousin's murderer, despite the fact that Mr. Lawrence specifically asked to be placed in any other pod except the one where this murderer was housed. Mr. Lawrence feared he would be attacked. Not surprisingly, the man who murdered Mr. Lawrence's cousin attacked Mr. Lawrence, but he was never punished or brought to justice. Rather, Mr. Lawrence was physically beaten by corrections officers and sustained serious injuries. He was thereafter denied adequate medical attention. Mr. Lawrence was further retaliated against by being placed in isolation and was denied the ability to take a shower.

- **Mr. Glenn Mayer, Jr.**

Mr. Mayer suffered from a neurological condition which caused him to have involuntary spasms or "twitches." The staff at the Cuyahoga County Jail knew of Mr. Mayer's condition. While Mr. Mayer was being handed medication, he experienced a spasm. Corrections Officer Hayes witnessed

this twitch and assaulted Mr. Mayer, squeezing his neck and slamming Mr. Mayer's elbow. The physical assault on Mr. Mayer went unpunished and Officer Hayes continued to harass and intimidate Mr. Mayer. Further, Mr. Mayer was denied adequate medical care despite an obvious need.

- **Mr. David Frunza**

Mr. Frunza was an inmate in the Cuyahoga County Jail who suffered from an epidural abscess and a spinal infection. Mr. Frunza's condition was obvious and objectively serious. Despite the seriousness of his conditions, the staff at the Cuyahoga County Jail failed to treat Mr. Frunza. As a result of the Cuyahoga County Jail staff failing to treat Mr. Frunza's serious medical condition, he suffered excruciating pain for approximately forty-two (42) days and now has permanent physical damage and emotional distress.

- **Ms. Tonya Clay, et al.**

On May 17, 2019, Ms. Tonya Clay and other Plaintiffs filed a lawsuit against Cuyahoga County and various other officials and individuals based on the inhumane conditions inside the Cuyahoga County Jail. Plaintiffs' Complaint details how Cuyahoga County has adopted customs, policies, and practices which are inhumane, pervasive, and unconstitutional. As a direct and proximate result of these same unconstitutional customs, policies, and practices, Brenden Kiekisz suffered physical injury, emotional distress, violations of his Constitutional rights, and other losses and damages.

133. The aforementioned individuals all experienced a violation of their Constitutional rights, either as a result of abuse at the hands of corrections officers or were otherwise treated with deliberate indifference to a serious medical problem.

134. However, the aforementioned incidents do not constitute an exhaustive list. There have been other similar incidents of excessive force, the denial of medical care, and the neglect and abuse of inmates with mental health issues—all of which demonstrate an environment of unlawful policies, customs, and practices.

135. Despite Defendants' knowledge of Brenden Kiekisz's need for emergency medical care, they were deliberately and callously indifferent to his risk of more serious injury and death.

136. The Defendants failed to offer or procure appropriate intervention and precautions for Brenden Kiekisz's serious, immediate, and life-threatening conditions.

137. Defendants jointly agreed and/or conspired with one another, and others, to complete false, misleading, and incomplete official reports and to give a false, misleading, and incomplete version of the events to certain superiors and the public in order to cover up their own misconduct and failure to properly care for Brenden Kiekisz.

138. All of the actions of the Defendants and their named and unnamed co-conspirators, as set forth above and below, were taken jointly, in concert, and with shared intent.

139.    All Defendants had a duty to care for and protect Brenden Kiekisz while he was in their custody, and they failed to do so.

140.    Defendants were deliberately indifferent to protecting Brenden Kiekisz from harm and failed to prevent said harm; furthermore, they failed to provide urgently needed medical and other health care. Their conduct was unreasonable in failing to protect Brenden Kiekisz from harm.

141.    Upon information and belief, no correctional officer, medical provider, or other Cuyahoga County Corrections Center employee has been disciplined in any way as a result of the conduct, acts, or omissions described in this Complaint.

142.    As a direct and proximate result of these Defendants' actions, as detailed above, Brenden Kiekisz and his heirs suffered, inter alia, injury, pain, distress, loss of love, affection, society, companionship, and consortium as well as other injuries as a result of his death and the continuing loss of his life.

143.    The injuries suffered by Brenden Kiekisz were all preventable had Defendants not engaged in illegal conduct in violation of his fundamental rights.

144.    Defendant Cuyahoga County ("the County") is responsible for the Cuyahoga County Corrections Center (CCCC), including the care and treatment of Detainees/Inmates—like Brenden Kiekisz—in custody therein. The County is required to ensure that the policies, practices, and customs of the CCCC comply with federal and Ohio law concerning the treatment of persons in custody.

145.    Unconstitutional and deplorable conditions in the CCCC are a historic problem. Defendants have long been on notice of—and have even taken action to

worsen—these conditions and have long been on notice of the incompetent supervision and management of the CCCC.

146.    The CCCC has been subjected to federal court monitoring at least twice in response to unconstitutional conditions of confinement within the jail.

147.    The County's track record of operating the CCCC demonstrates longstanding, systematically unconstitutional operational procedures.

148.    CCCC today operates in complete crisis. Upon information and belief, at least nine people have died in CCCC since 2018, including Brenden Kiekisz, and over 55 people attempted suicide while in CCCC custody in 2018. The rates of in-custody deaths, assaults by correctional officers, deprivations of basic human rights, and safety of Detainees/Inmates and staff alike have all reached emergency levels.

149.    It has been reported that, after each death, someone confiscated the housing unit logs from the time of the death and replaced them with new logs.

150.    Detainees/Inmates and their families have raised innumerable concerns and complaints about deplorable conditions. Some CCCC staff have quit their jobs in protest. Other stakeholders, including judges in the Cleveland Municipal Court and Cuyahoga Common Pleas Court, have expressed serious concern over jail conditions and the manner in which the facility is being operated.

151.    As of November 2017, the Ohio Department of Rehabilitation and Corrections (ODRC) Bureau of Adult Detention inspection found CCCC was not in compliance with Ohio's Minimum Standards for Adult Detention Centers.

152.    Likewise, the Pretrial Justice Institute (PJI) found in 2017 that CCCC was overcrowded. The PJI report found that on average, CCCC has been operating at over 100% capacity for four of the past five years. (*See* Pretrial Justice Institute, "Enhancing Pretrial Justice in Cuyahoga County: Results from a Jail Population Analysis and Judicial Feedback," September 2017, available at https://university.pretrial.org/HigherLogic/System/DownloadDocumentFile. ashx?DocumentFileKey=c4587ef2-8416-18fe-e19d-b188d3691e93&forceDialog =0.)

153.    Further, the Cuyahoga County Bail Task Force found in March 2018, that Inmates/Detainees remain in CCCC custody for unnecessarily long periods of time.

154.    The County has long been on notice of overcrowding and medical and mental health issues—since at least 2017—but has not remedied this critical problem and instead has increased overcrowding.

155.    Further, as indicated, the United States Marshals Service (USMS) issued a report on November 21, 2018, condemning the conditions in the CCCC. This report documented numerous failings discovered in USMS's thorough review of conditions, policies, and practices at CCCC. The report concluded that conditions in CCCC are inhumane and dangerous for both Inmates/Detainees and corrections officers. USMS Report as reported on and included in full at:

156.    https://www.cleveland.com/news/2018/11/read-the-full-us-marshals-report -about-conditions-in-cuyahoga-county-jail.html

157. The USMS Report found the CCCC deficient in, *inter alia,* intake procedures, the provision of medical care, inmate abuses, violations of Constitutional rights, and other violations relevant to Brenden Kiekisz's claims.

158. The USMS report found that CCCC is severely overcrowded and identified 96 corrections officer vacancies, indicating severe understaffing. The report states, "as a result of the high vacancy rate and excessive staff call outs, the CCCCs daily operation is greatly impacted regarding provision for detainees'/inmates' basic needs."

159. USMS's documentation of deficiencies in intake evaluations, medical care, and dangerously low understaffing is consistent with the experience of Brenden Kiekisz.

160. As evidenced in the USMS report and Plaintiffs' accounts, CCCC is in violation of the Ohio minimum jail standards, as defined in Ohio Admin. Code § 5120:1-8, pertaining to operation of full-service jails in the State of Ohio. Violations Ohio Admin. Code § 5120:1-8 include, but are not limited to:

- Failure to arrange for all levels of health care, including initial screenings upon booking and including ongoing mental health care, and failure to assure quality, accessible, and timely services for inmates;

- Failure to ensure that all health and mental health personnel are appropriately credentialed, with verification of current credentials on file at the facility;

- Failure to provide a daily procedure whereby inmates have an opportunity to report medical and mental health complaints through health-trained personnel, or for urgent matters, to any jail employee, along with failure to

43

provide a grievance system for medical and mental health treatment, where daily complaints and grievances are addressed in a timely manner, recorded and maintained on file, reviewed daily by a qualified health care personnel, and treatment or follow-up are provided as necessary; and

- Failure to maintain accurate health/mental health records in written or electronic format.

### Former CCCC Official Removed Over Public Statements about Denial of Detainees'/Inmates' Access to Adequate Medical Care

161. Gary Brack, former Director of Ambulatory Care at CCCC, spoke out against the conditions at CCCC at a May 2018, Cuyahoga County Council meeting. Brack blamed former Director of Regional Corrections Kenneth Mills "for meddling in jail healthcare, obstructing the hiring of nurses, and creating an unsafe environment for staff by scaling back security in the jail's medical unit." (*See* Adam Ferrise, "Ex-Cuyahoga County Jail Supervisor Subpoenaed to testify before Grand Jury," *Cleveland.com* (Dec. 10, 2018), available at: https://www.cleveland.com/metro/2018/12/ex-cuyahoga-county-jail-medical-supervisorsubpoenaed-to-testify-before-grand-jury.html.)

162. Rather than launching an investigation into the medical care crisis at the CCCC or investigating whether Mills was fit to continue in the director position, Defendant Budish removed Gary Brack because Brack was outspoken and critical against Mills.

163. County spokeswoman Mary Louise Madigan characterized this conflict, noting that "Armond [Budish] did have a meeting at Metro. It was clear that Mr.

Brack and the jail director, Ken Mills, didn't work well together, and we asked that he not be returned to his position at the jail." (*See* Courtney Astolfi and Adam Ferrise, "Budish Personally Requested Ouster of County Jail's Medical Supervisor Who Criticized Jail Administration," *Cleveland.com* (Dec. 13, 2018), available at https://www.cleveland.com/metro/2018/12/budish-personally-requested-ouster-of-cuyahoga-county-jails-medical-supervisor-who-criticized-jail-administration-sources-say.html.

164. After Brack's appearance at the May 2018, County Council meeting, at least seven inmates died in Cuyahoga County's custody within a span of barely four months, including inmates likely not receiving proper psychiatric and/or medical care.

165. Defendant Cuyahoga County provided improperly redacted records concerning the deaths to members of the media. Though the County subsequently provided unredacted records, full records about these deaths have not been released to the media or the public. (*See* Adam Ferrise, "Death of Cuyahoga County Jail inmate subject of criminal investigation: What we know about 7 jail deaths," *Cleveland.com* (Nov. 21, 2018), available at https://www.cleveland.com/expo/news/erry-2018/11/12db721f324418/death-of-cuyahoga-county-jail.html.

166. Though County Executive Armond Budish has publicly stated that CCCC is the largest mental health provider in Ohio, upon information and belief, CCCC has not had a staff psychiatrist since April 2018, and only one nurse practitioner

administers mental health care 10 hours a day, four days a week. CCCC does not offer any mental health care for the rest of the time.

167.     Lack of adequate staffing of corrections officers further exacerbates the denial of access to medical and mental health care because there are not sufficient corrections officers to escort Detainees/Inmates to and from the medical and mental health units.

168.     In June 2018, a state inspector found that CCCC failed to complete required intake medical assessments within the legally required timeframe.

169.     This delay results in Detainees/Inmates with serious mental health and medical needs being denied proper care and necessary medication and/or treatment when they enter CCCC facilities.

170.     Marcus Harris, former jail nursing director, has also stated that inmates at the Euclid Jail, also run by Defendant Cuyahoga County under regionalization of jail operations, often did not receive the required initial medical assessment upon booking, leaving medical conditions unchecked for days.

171.     In May 2018, Mr. Harris stated that he quit his job at CCCC in January amid inmate safety and ethics concerns. He believes the conditions at CCCC were so unsafe that "every day when [he] went to work [he] had to wonder if someone was going to be dead or assaulted." (*See* Courtney Astolfi, "Inmates deprived of proper medical care under Cuyahoga County jail director, former nursing supervisor says," *Cleveland.com* (May 31, 2018), available at: https://www.cleveland.com/metro/index.ssf/2018/05/inmates_deprived_of_proper _med.html.

172.    Compounding medical and mental health issues, CCCC regularly denies Detainees/Inmates access to necessary hygiene products, including sanitary pads and soap, and access to sufficient cleaning supplies to attempt to keep their own living areas, bedding, and clothing clean and sanitary.

173.    Defendants lack adequate policies, practices, training, and supervision for staff concerning how to respond to detainees/inmates having drug intoxication.

### FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 Against Defendants for Deliberate Indifference to Serious Medical Needs in Violation of the Eighth and/or Fourteenth Amendment

174.    Paragraphs 1 through 173 are incorporated by reference herein as if fully rewritten.

175.    The Defendants observed Brenden Kiekisz and objectively knew he was in a state of mental and emotional breakdown.  Cuyahoga County was on actual notice of Brenden Kiekisz's physical symptoms, diminished mental functioning, and the fact that he was suicidal and needed mental health intervention as well as his prescribed mental health medications.

176.    These Defendants were put on actual notice that Brenden Kiekisz was in the throes of a physical crisis.  Brenden Kiekisz was also clearly experiencing a mental health crisis.

177.    Defendants knew, both by report and by observation, that Brenden Kiekisz required immediate psychiatric intervention and hospitalization for his condition.

178.    Brenden Kiekisz was entitled to care and treatment for his serious medical condition.

179.   Defendants callously failed to respond to Brenden Kiekisz's medical condition and need for emergency psychiatric intervention and medications.

180.   None of these Defendants, despite their legal duties, responded to Brenden Kiekisz's emergency medical needs.

181.   Rather, and based on the facts set forth herein, these Defendants delayed and therefore interfered with Brenden Kiekisz obtaining necessary and life-saving medical care.  As such, their conduct in this regard was willful, wanton, reckless, and malicious as well as a violation of his Constitutional rights.

182.   Defendants were therefore deliberately indifferent to Brenden Kiekisz's serious medical needs in violation of his rights as protected by the Eighth and/or Fourteenth Amendments to the United States Constitution.

## SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983 Supervisory Liability Against Defendants)

183.   Paragraphs 1 through 182 are incorporated by reference herein as if fully rewritten.

184.   Defendants Budish, Leiken, Mills, Ivey, Tallman, and Hollaran, and Cuyahoga County (the supervisory Defendants) are liable in their role as supervisors.

185.   As alleged herein, Brenden Kiekisz's rights were violated by Cuyahoga County Defendants as outlined herein.

186.    The supervisory Defendants were personally involved in the violation of Brenden Kiekisz's rights by, among other acts:

      i.     Directly participating in the conduct of subordinate Defendants by acquiescing to and failing to intervene to correct the actions of the

subordinates once it was known that these actions were occurring;

ii. Failing to train their subordinates, including these named Defendants, on topics including but not limited to engaging in crisis interventions, interacting with suicidal, depressed and/or bipolar individuals or individuals who they know or have reason to believe are experiencing the ill effects of a mental health crisis and other topics relevant and set forth herein when the need for additional training was apparent throughout their actions and inactions, creating a policy, practice, or custom in which violations occurred;

iii. Consistently failing to supervise and train their subordinates, including these named Defendants, such that the violation of a citizen's rights were highly predictable under the usual and recurring circumstances and did occur against Brenden Kiekisz in the manner predicted;

iv. Remaining deliberately indifferent to and consciously disregarding the rights of citizens and civilians by failing to act on information that Constitutional rights were being violated.

187. The supervisory Defendants' failures to supervise and train, and their participation in the conduct of their subordinates was affirmatively linked to the violations of Brenden Kiekisz's state and federally protected rights.

188. As a direct and proximate result of the supervisory Defendants' failure to supervise and train their subordinates, and in participating in their course of conduct, Brenden Kiekisz was forced to endure and suffer severe physical, mental and emotional injuries, and death.

189. In failing to train and supervise and by participating in their subordinates' conduct, the supervisory Defendants acted wantonly, willfully, recklessly, maliciously, without legal justification, and with deliberate indifference to Brenden Kiekisz's federally protected rights warranting the imposition of exemplary punitive damages.

**THIRD CAUSE OF ACTION**
**(Willful, Wanton, Reckless, Malicious, and Bad Faith Conduct Against Defendants)**

190.    Paragraphs 1 through 189 are incorporated by reference herein as if fully rewritten.

191.    As set forth herein, the Defendants failed to exercise due care and acted in a willful, wanton, reckless, malicious, and/or in bad faith manner while acting in the course and scope of their employment and under color of law which culminated in the death of Brenden Kiekisz such that they are not entitled to the defenses and immunities for negligent conduct as set forth in O.R.C. §2744.01 *et seq.*

*192.*    The Defendants failed to recognize and/or ignored the fact that Brenden Kiekisz was experiencing an emergency mental health crisis and needed immediate medical attention. They failed to intervene on behalf of Brenden Kiekisz despite appreciating his serious medical needs and having the opportunity to intervene on his behalf, and they also took ill-advised steps which were contrary to training and procedures. They failed to provide suicide prevention assistance and other emergency medical care. They took steps which hindered the provision of medical care. They failed, in one way or another, to protect Brenden Kiekisz's civil rights and/or to prevent his rights from being violated. These mistakes and other mistakes as set forth herein were made in a wanton, willful, reckless, and/or malicious manner.

*193.* The failure of these Defendants to treat Brenden Kiekisz's medical emergency is what led to him suffering bodily harm, emotional distress, and death.

*194.* As a direct and proximate result of these Defendants' acts and omissions as set forth herein, Brenden Kiekisz suffered severe physical injuries, emotional and mental distress, and death.

### FOURTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress Against Defendants)

195. Paragraphs 1 through 194 are incorporated by reference herein as if fully rewritten.

196. Defendants either intended to cause emotional distress or knew or should have known that their actions would result in serious emotional distress to Brenden Kiekisz.

197. These Defendants engaged in conduct so outrageous as to go beyond all possible bounds of decency and was utterly intolerable in a civil society.

198. As a direct and proximate result of these Defendants' actions and inactions, Brenden Kiekisz suffered psychic injury prior to his death; and the mental anguish suffered by Brenden Kiekisz was serious and of a nature that no reasonable person could be expected to endure.

199. These Defendants' infliction of emotional distress was also willful, wanton, reckless, malicious, and/or in bad faith.

### FIFTH CAUSE OF ACTION
### (Negligent Hiring, Training, Retention, Discipline and Supervision)

200.    Paragraphs 1 through 199 are incorporated by reference herein as if fully rewritten.

201.    Defendants Budish, Leiken, Mills, Ivey, Tallman, Halloran, MetroHealth and Cuyahoga County employed and/or supervised the non-supervisory Defendants and knew or should have known that these employees had a propensity for failing to provide medical care, failing to provide adequate medical care, failing to perform intake evaluations, failing to perform meaningful health screenings and evaluations, not intervening on behalf of inmates when there is both the need and the legal duty to do so, destroying evidence, misleading other officials in their analysis of the Cuyahoga County Jail, and acting with deliberate indifference to the serious medical needs of individuals under their care, custody, and control, and otherwise acting or failing to act in an appropriate manner consistent with their legal duties in situations similar to the one they faced with Brenden Kiekisz.

202.    Defendants Budish, Leiken, Mills, Ivey, Tallman, Halloran, MetroHealth and Cuyahoga County also failed to adequately train these employees relative to providing adequate medical care, performing intake evaluations, performing meaningful health screenings and evaluations, intervening on behalf of an inmate, recognizing emergency conditions, destroying evidence, misleading other officials in their evaluation of the Cuyahoga County Jail, and acting with deliberate indifference to the serious medical needs of individual and other areas of training relevant to the matter herein which on their face were violative of the Fourth, Eighth and/or Fourteenth Amendment and otherwise acting in an

appropriate manner consistent with their legal duties in situations similar to the one they faced with Brenden Kiekisz and further was the direct and proximate cause of Brenden Kiekisz's severe physical pain, emotional and mental distress, and death.

## SIXTH CAUSE OF ACTION
### (Failure to Intervene)

203.   Paragraphs 1 through 202 are incorporated by reference herein as if fully rewritten.

204.   Defendants as set forth herein all had the opportunity as well as the legal duty to intervene on behalf of Brenden Kiekisz so as to prevent his rights from being violated, or to curtail the violation of his rights.

205.   Each of these Defendants failed in this regard and are therefore liable.

206.   These Defendants actions and inactions were under color of law and deprived Brenden Kiekisz of federally protected rights.

207.   These Defendants actions and inactions were willful, wanton, reckless and/or malicious and also deprived Brenden Kiekisz of his rights under the State of Ohio and the Ohio Constitution.

208.   As a direct and proximate result of the wrongful acts and omissions as set forth herein, these Defendants caused Brenden Kiekisz to suffer extreme physical pain, severe mental and emotional distress, and loss of life.

## SEVENTH CAUSE OF ACTION
### (Wrongful Death)

209.    Paragraphs 1 through 208 are incorporated by reference herein as if fully rewritten.

210.    As a direct and proximate result of the Defendants' acts and omissions as set forth herein, individually, and/or collectively, Plaintiff's Decedent, Brenden Kiekisz, suffered his untimely and wrongful death.

211.    As a direct and proximate result of Brenden Kiekisz's wrongful death, Brenden's next of kin have and will forever suffer those injuries and damages as set forth in Ohio's wrongful death statutes.

212.    Paula Kiekisz, Brenden's Mother, is the Administrator of Brenden Kiekisz's Estate.  Paula Kiekisz brings this action pursuant to Ohio Revised Code §2125.02, *et seq.*

### EIGHTH CAUSE OF ACTION
### (Survivorship Action)

213.    Paragraphs 1 through 212 are incorporated by reference herein as if fully rewritten.

214.    As the Administrator of the Estate of Brenden Kiekisz, Plaintiff Paula Kiekisz also brings this action for the injuries, conscious pain and suffering, and all other damages her son Brenden Kiekisz suffered prior his death and for the benefit of his Estate.

### NINTH CAUSE OF ACTION
### (5TH AND 14TH DUE PROCESS)

215.    Paragraphs 1 through 214 are incorporated herein by reference as if fully rewritten.

216.    The facts as set forth herein establish that Brenden Kiekisz, an individual with diagnosed mental health conditions, was in a special relationship with the Defendants within the meaning of the case law interpreting 42 U.S.C. §1983 and the Fifth Amendment, which guarantees equal protection of the laws and prohibits any person acting under color of law from subjecting any person in custody to punitive conditions of confinement without due process of law.

217.    Defendants, acting under the color of law, intentionally and with conscious, callous, and unreasonable indifference deprived Brenden Kiekisz of his constitutional rights to due process and equal protection.

218.    The Defendants' conduct, as described herein, their acts and/or omissions constituted deliberate indifference to Brenden Kiekiesz' medical needs, was unreasonable and violated his rights under the Fifth Amendment and Fourteenth Amendment to the United States Constitution to due process of law and equal protection and therefore violated 42 U.S.C. §1983.

219.    Defendants' conduct, as described herein, their acts and/or omissions were the direct and proximate cause of the violations of Brenden Kiekisz' Fifth and Fourteenth Amendment rights, his mental suffering, anguish and other injuries.

220.    Defendants are jointly and severally liable for this conduct.

## TENTH CAUSE OF ACTION
### (Americans with Disabilities Act and Section 504 Claim)

221.    Paragraphs 1 through 220 are incorporated herein by reference as if fully rewritten.

222.    Defendant CCCC and/or MetroHealth is and has been a recipient of federal funds, and is covered by the mandate of Section 504 of the 1973 Rehabilitation Act (29 U.S.C. §794).  Section 504 requires that persons with disabilities be reasonably accommodated in their facilities, program activities, and services and reasonably modify such facilities, services and programs to accomplish this purpose.

223.    Further, Title II of the Americans with Disabilities Act (42 U.S.C. §§12131-12134) applies to Defendant Cuyahoga County and/or MetroHealth and has essentially the same mandate as that expressed in §504.

224.    The CCCC is a facility and its operations comprises a program and service for §504 and Title II purposes.

225.    Defendants Cuyahoga County and/or MetroHealth failed and refused to reasonably accommodate Brenden Kiekisz's mental health conditions and disabilities and to modify their jail facilities, operations, services, accommodations and programs to reasonably accommodate his disability in violation of Title II of the ADA and/or §504 when he was in their custody.

226.    Defendants' failures directly and proximately caused the death of Brenden Kiekisz and the violations of the ADA and/or §504 were the specific proximate cause of his death and the resulting damage to his family and estate.

227.    Plaintiff's estate is entitled to recover for those damages sustained as described in this Complaint as a result of the Defendants' violations of the ADA and §504 which caused Brenden Kiekisz' death.

228.    Defendants are jointly and severally liable for this conduct.

## ELEVENTH CAUSE OF ACTION
### (Medical Malpractice)

229.    Paragraphs 1 through 228 are incorporated herein by reference as if fully rewritten.

230.    Defendants had a legal duty to provide Brenden Kiekisz with a standard of medical and psychiatric care.

231.    The acts and omissions of the Defendants as outlined herein constitute a breach of the standard of care applicable under these circumstances.

232.    As a direct and proximate result of the Defendants' breach of the standard of care, Brenden Kiekisz was forced to suffer pain, distress, anguish and death.

233.    The Defendants are jointly and severally liable for this breach of the standard of care and for the resulting damages.

## TWELFTH CAUSE OF ACTION
### (§1983 *Monell* Claim Against Defendant Cuyahoga County and/or MetroHealth)

234.    Paragraphs 1 through 233 are incorporated herein by reference as if fully rewritten.

235.    The actions of the Defendants were taken pursuant to one or more interrelated *de facto* as well as explicit policies, practices and/or customs of Defendant Cuyahoga County, its officers, agents and/or officials.

236.    The actions of the Defendants were also taken pursuant to one or more interrelated *de facto* as well as explicit policies, practices and/or customs of Defendant MetroHealth, its officers, agents and/or officials.

237.    Defendant Cuyahoga County, acting at the level of official custom, policy, practice and custom, with deliberate, callous, conscious, and unreasonable

indifference to Brenden Kiekisz' constitutional rights, authorized, tolerated, and institutionalized the practices and ratified the illegal conduct herein described, and at all times material to this Complaint, the Defendant Cuyahoga County, MetroHealth, and/or CCCC, its agents and/or officials had interrelated *de facto* policies, practices, and customs which included but were not limited to:

-     Failing to properly train, supervise, discipline, transfer, monitor, counsel and otherwise control corrections officer, health care providers and other jail staff;

-     Failing to appropriately and timely identify serious mental health medical issues and the needs of pre-trial detainees in a state of mental health crisis such as Brenden Kiekisz;

-     Failing to appropriately recognize suicidal ideations and tendencies in pre-trial detainees such as Brenden Kiekisz despite objectively clear and obvious indications of mental health issues and a propensity to engage in self-harm;

-     Failing to timely refer pre-trial detainees such as Brenden Kiekisz to appropriate mental health providers and for mental health services despite an objectively clear and serious need;

-     Failing to segregate pre-trial detainees such as Brenden Kiekisz from the general population and place them on suicide watch and implement suicide precautions;

-     Failing to timely and adequately communicate critical information regarding pre-trial detainees such as Brenden Kiekisz and who are experiencing a mental health crisis regarding their mental health conditions and the risk of suicide;

- Failing to provide pre-trial detainees suffering from mental health issues such as Brenden Kiekisz with appropriate medications despite being informed of the medications and the need to provide them;

- Ignoring such obvious signs of suicidal ideations, tendencies and other mental health crisis such as a recent suicide attempt and inmates presenting with injuries reflecting or suggesting self-harm;

- Failing and refusing to correct, discipline, and follow-up on deficiencies noted in the care, treatment and/o supervision of detainees with mental health issues or other health crises such as Brenden Kiekisz;

- Possessing knowledge of deficiencies in the policies, practices, customs and procedures concerning detainees, and approving and/or ratifying and/or deliberately turning a blind eye to those deficiencies.

238.    Specifically, CCCC personnel, correctional officers, health care personnel, and other jail employees are not properly trained relative to performing an intake, assessing new inmates, screening inmates for mental and physical health issues, identifying inmates with health issues, referring and/or dealing with inmates with mental health issues including but not limited to suicidal ideations and/or tendencies, and protecting or intervening on behalf of inmates with mental health issues and/or suicidal ideations to protect them from harm.

239.    These policies, practices, procedures and customs as set forth herein both individually and together were maintained and implemented unreasonably and with deliberate indifference.

240.    These policies, practices, procedures and customs as set forth herein both individually and together were encouraged, ratified, and permitted to become part of the accepted practices at the CCCC, and these included but were not limited to failing to adequately observe detainees to identify problematic behavior such as self-harm, failing to adequately screen detainees for mental health issues and further failing to process what information was obtained, failing to appreciate the import of a recent suicide attempt as well as diagnoses of mental health issues and the inmates taking and need to continue taking prescription medication related to his mental health and the avoidance of self-harming behaviors, failing to respond to the express request for mental health treatment and for suicide prevention measures, failing to ensure that floor cards were not mislabeled, mishandled, forged or otherwise mismanaged such that the failure to manage to floor card system would serve to preclude detainees/inmates from obtaining the mental health or other health treatment they needed.

241.    Further, the Constitutional violations and damages to Brenden Kiekisz that occurred as described herein were directly and proximately caused by the unofficial and/or official, tacit and/or expressed policies, customs, and practices; and otherwise unconstitutional policies of authorized policy makers of the Defendants who deliberately ignored detainees being subjected to unreasonable risk of harm, deliberately ignored violations of appropriate intake and screening procedures, and deliberately failed to supervise and control correctional officers, health care providers and other jail staff so as to prevent a violation of detainees' rights.

242.    These interrelated policies, practices, procedures and practices, as set forth herein, both individually and together, were maintained and implemented unreasonably and with deliberate indifference; and, encouraged the Defendants to commit the aforementioned acts and omissions relative to Brenden Kiekisz and therefore were the direct and proximate causes of the Constitutional violations set forth herein which ultimately resulted in Brenden Kiekisz' death.

## THIRTEENTH CAUSE OF ACTION
### (Violation of Ohio Civil Rights Act)

243.    Paragraphs 1 through 242 are incorporated herein by reference as if fully rewritten.

244.    For the purposes of this Cause of Action and Thirteenth Count of Plaintiff's Complaint, Plaintiff sues Defendants Budish Leiken, Tallman, Pinkney, Ivey, Mills, Halloran, Marsh, Trovato and John Does 1-10 solely in their individual capacity.

245.    As a direct and proximate result of engaging in the conduct described in detail and enumerated above in the foregoing paragraphs, Defendants Budish Leiken, Tallman, Pinkney, Ivey, Mills, Halloran, Marsh, Trovato and John Does 1-10 thereby violated the Ohio Civil Rights Act in that they interfered and deprived Brenden Kiekisz of his exercise and enjoyment of his civil rights secured under the laws of the State of Ohio.  As a direct and proximate result thereof, Brenden Kiekisz suffered mental anguish, emotional distress, conscious pain and suffering, and a premature and preventable death.

## FOURTEENTH CAUSE OF ACTION
### (MetroHealth: Vicarious Liability/*Respondeat Superior*)

246.   Paragraphs 1 through 245 are incorporated herein by reference as if fully rewritten.

247.   Defendant MetroHealth is vicariously liable for some or all of the actions, omissions, and conduct of its officers, representatives, employees, agents, and/or servants as set forth in the preceding paragraphs of this Complaint and under the doctrine of *respondeat superior*.

## DAMAGES

248.   Paragraphs 1 through 247 are incorporated by reference herein as if fully rewritten.

249.   As a direct and proximate result of the Defendants' acts, omissions, and misconduct, Brenden Kiekisz sustained, prior to his death, fear for his life and traumatic shock to his physical, mental, and emotional well-being.

250.   As a further direct and proximate result of the Defendants' acts, omissions and misconduct, and as a result of the wrongful death of Brenden Kiekisz, his survivors, next of kin, and/or heirs have suffered damages, including but not limited to the loss of his support, services, society, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education.

251.   As a further direct and proximate result of the wrongful death of Brenden Kiekisz, the Decedent's survivors, next of kin, and/or heirs have suffered other damages including but not limited to grief, depression, and severe emotional distress.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Administrator Paula Kiekisz prays for judgment against the Defendants, jointly and severally, for:

(A)     Compensatory and consequential damages for all the injuries, damages and losses identified in an amount to be determined by the Court and in excess of Twenty-Five Thousand dollars ($25,000.00);

(B)   Punitive damages in an amount to be determined at trial for the willful, wanton, reckless and malicious conduct of the individually named Cuyahoga County Defendants;

(C)     Declaratory and injunctive relief against Cuyahoga County enjoining unlawful policies, practices, procedures and customs and ordering the institution of policies, practices, procedures and training for the Cuyahoga County Corrections Center to bring them into compliance with Constitutional standards;

(E)     All reasonable funeral and burial expenses;

(F)     Attorneys' fees and the costs of this action and other costs that may be associated with this action; and

(G)     Any and all other relief this Court deems equitable, necessary, and just.

Respectfully Submitted,

The Law Office of Paul J. Cristallo

*/s/ Paul J. Cristallo*                .
PAUL J. CRISTALLO (0061820)
The Brownhoist Building
4403 St. Clair Avenue
Cleveland, OH 44103
T: 440-478-5262
F: 216-881-3928
E: paul@cristallolaw.com

Counsel for Plaintiff Paula Kiekisz, as
Mother and Administrator of the Estate of
Brenden Kiekisz, Deceased.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

/s/ Paul J. Cristallo
PAUL J. CRISTALLO (0061820)
Counsel for Plaintiff Paula Kiekisz,
as Mother and Administrator of the Estate of
Brenden Kiekisz, Deceased.

1

```
1    THE STATE OF OHIO, )
                        )  SS:   MICHAEL DONNELLY, J.
2    COUNTY OF CUYAHOGA.)
                  IN THE COURT OF COMMON PLEAS
3                    CRIMINAL DIVISION

4    THE STATE OF OHIO,          )
                                 )
5                    Plaintiff,  )
                                 )
6         -v-                    )  Case No. CR-611192
                                 )
7    BRENDEN KIEKISZ,            )
                                 )
8                    Defendant.  )

9                         -  -  -  -

10          ,  DEFENDANT'S TRANSCRIPT OF PROCEEDINGS

11                        -  -  -  -

12   APPEARANCES:

13       CRAIG SMOTZER, ESQ.,

14              On behalf of the Defendant.

15

16

17

18

19   Michelle L. Simko, RPR
     Official Court Reporter
20   Cuyahoga County, Ohio

21

22

23

24

25
```

2

```
 1   THE STATE OF OHIO, )
                       )  SS:   MICHAEL DONNELLY, J.
 2   COUNTY OF CUYAHOGA.)

 3              IN THE COURT OF COMMON PLEAS
                    CRIMINAL DIVISION
 4
     THE STATE OF OHIO,          )
 5                               )
                    Plaintiff, )
 6                               )
        -v-                      )  Case No. CR-611192
 7                               )
     BRENDEN KIEKISZ,            )
 8                               )
                    Defendant. )
 9
                         -  -  -  -
10
              DEFENDANT'S TRANSCRIPT OF PROCEEDINGS
11
                         -  -  -  -
12
         BE IT REMEMBERED, that at the SEPTEMBER 2018 term
13   of said Court, to-wit, commencing on THURSDAY, DECEMBER
     27, 2018, this cause came on to be heard before the
14   Honorable MICHAEL DONNELLY, in Courtroom No. 19-A,
     Courts Tower, Justice Center, Cleveland, Ohio, upon the
15   indictment filed heretofore.

16                       -  -  -  -

17

18

19

20

21

22

23

24

25
```

```
1   THURSDAY, DECEMBER 27, 2018, MORNING SESSION
2                   PROCEEDINGS:
3            THE COURT:    Let record reflect
4   that we're here on a probation violation
5   hearing.  This is on criminal Case No. 611192,
6   State of Ohio vs. Mr. Brenden Kiekisz.  So who
7   supervises you?
8            THE DEFENDANT:    Rita White.
9            THE COURT:    Okay.  And so
10  apparently there was some type of drug use.
11  You're in treatment in lieu, and there was
12  some type of active drug use that led to an
13  overdose?
14           THE DEFENDANT:    Yes, I was
15  supposed -- my first week I got out of here, I
16  was supposed to go see -- I went and seen Rita
17  White, and then she told me to come back in a
18  week.  I was clean when I dropped for her.
19  But before I went back to go see her again, I
20  was having suicidal thoughts.  So I went to
21  Highland Springs.  I spent about two weeks
22  there.
23           I got out, and I ended up overdosing
24  on heroin, and then I went back to Highland
25  Springs.  October 7th was the day I overdosed,
```

1   and it scared me.  I was in ICU at Metro

2   Hospital for five days, and then I was at

3   Ahuja Hospital for about 14 days trying to

4   regain the left side of my body back.

5           THE COURT:    Let me hear from your

6   counsel first.

7           MR. SMOTZER:    Thank you, your

8   Honor, may it please the Court.

9           That pretty much sums up what brings

10  him here before you today.  He was has been

11  suffering it sounds like from not only drug

12  addiction, but from mental health issues.

13  He's been diagnosed with PTSD, but we believe

14  there's some depression -- pretty severe

15  depression and anxiety which led him to

16  self-harm behavior.  So he took himself to the

17  hospital, because he was having suicidal

18  thoughts.

19          He then missed his report date.  He

20  got out, and then with no support and the fear

21  of just ending up in county jail, he asks for

22  no further help, ends up overdosing on what he

23  believed to be heroin, but was most likely

24  Fentanyl.

25          THE DEFENDANT:    Fentanyl and

5

```
1    Xanax.
2              MR. SMOTZER:    Fentanyl and Xanax.
3    And here we are, your Honor.
4              THE COURT:    Do you have any
5    criminal record, other than this case?
6              THE DEFENDANT:    I went to city
7    court for a panhandling ticket yesterday.
8              THE COURT:    Okay.  Is that -- when
9    did that takes place?
10             THE DEFENDANT:    That was about two
11   years ago I think that case was.  And I've
12   been here twice, and they've never called me
13   down to court for that until yesterday.
14             THE COURT:    What is Ms. White's
15   recommendation for you; do you know?
16             THE DEFENDANT:    She wanted me to
17   do IOP.  And before I went into IOP, that's
18   when I went to Highland Springs.  And I was
19   going to IOP -- she gave me a place to do IOP
20   through, but when I went to Highland Springs,
21   I called her from there, and she said if I can
22   get in the IOP there, also, that I could do it
23   there.
24             THE COURT:    What is Highland
25   Springs, is that inpatient?
```

6

```
1              THE DEFENDANT:     It's a detox mental
2    hospital.  And they have an outpatient program
3    there, too.  It's not like Signature Health.
4    It's not like a Suboxone-based program, it's
5    more or less 12 steps.
6              THE COURT:    When was the last TASC
7    Assessment that you received?
8              THE DEFENDANT:     I was there in the
9    end of October.
10             THE COURT:    Okay.  And so what is
11   your living situation?
12             THE DEFENDANT:     I'm still staying
13   at my grandfather's house.  I really don't
14   know how much longer that is going to last.
15   So I was trying to hopefully go back to
16   Highland Springs.  This will be a good number
17   of times I've been there.  But they will be
18   able to help me find somewhere else to go,
19   because I don't want to live in that
20   neighborhood no more.
21             THE COURT:    Have you ever been
22   accessed for drug court?
23             THE DEFENDANT:    No, I don't know
24   anything about it.
25             THE COURT:    No?  Is that something
```

7

1      that you think would benefit him?

2            MR. SMOTZER:    If he would

3      successfully participate it in it, your Honor,

4      I think -- maybe it would save him from the

5      felony conviction, albeit it's a stricter,

6      more regimented regime, I know Judge Matia can

7      be a little less tolerant when dealing with an

8      opiate addiction, you know, not in a bad way,

9      but he expects more from his participants.

10           THE COURT:    Well, if it works to

11     save your life, it might be worth it.   Sounds

12     like you dodged a bullet.

13           Court is going to find you in

14     violation.   I'm going to talk to Ms. White

15     this morning to see what her thoughts are on

16     drug court.   And, you know, we're either going

17     to go that route or the inpatient treatment

18     back at -- what is the name of the place?

19           THE DEFENDANT:    Highland Springs.

20           THE COURT:    Highland Springs.   Do

21     you have insurance to pay for it?

22           THE DEFENDANT:    It's United Health

23     Care through Medicaid.   I'm feeling really

24     messed up about my medications right now.

25     It's been two days since I took them.

8

1                THE COURT:     You haven't been seen

2  by the psychiatric unit?

3                THE DEFENDANT:    No, I don't even

4  think they give me my medications here.

5                THE COURT:     They don't?

6                THE DEFENDANT:    This is the place

7  that causes the depression.  I'm losing it in

8  here.

9                THE COURT:     All right.  I'll call

10  over this morning, and we'll get you moving

11  towards treatment.

12                THE DEFENDANT:    How does that work

13  out, like I'll be here for a while still in

14  here?

15                THE COURT:     I'm going to try to

16  limit that.  I want you out of here as soon as

17  possible, back in treatment.

18                THE DEFENDANT:    Okay.  How will I

19  know anything, because I can't call nobody

20  from the outside, no one will pick up?

21                THE COURT:     Your grandfather

22  won't --

23                THE DEFENDANT:    He died.  He

24  passed.  My grandpa is gone.

25                MR. SMOTZER:     His father owns the

9

```
 1    house now, and his father has let friends live

 2    in that home.

 3              THE COURT:      He let it go?

 4              MR. SMOTZER:      I represented him

 5    last time.  His father will call and follow up

 6    at some point here, because he watches the

 7    docket.  I don't even know if they're talking

 8    to him.

 9              THE COURT:      Do you know how I can

10    get ahold of your dad?

11              THE DEFENDANT:      I can give you his

12    cell number.

13              THE COURT:      What is it?

14              THE DEFENDANT:      (440)371-0885

15              THE COURT:      Okay.  What is his

16    name?

17              THE DEFENDANT:      John Kiekisz.

18              THE COURT:      Okay.  I'll call him

19    today.

20              THE DEFENDANT:      All right.  And I

21    don't know how you would feel about this, but

22    if I was able to get out and continue my IOP,

23    if I ever end up in this courtroom again, you

24    can max me out.  I'll make sure I never end up

25    in here again.
```

10

1          THE COURT:     I remember the last

2     time you were before me.  I don't know what to

3     do, I mean --

4          THE DEFENDANT:     Because this place

5     isn't helping me.  And if I can get out of

6     here today, I could be in Highland Springs by

7     myself tomorrow.  They'll take me right in

8     there.

9          THE COURT:     I'll talk to

10    Ms. White.  But what if you take off and you

11    go use before you go there?

12         THE DEFENDANT:     That's not what I

13    have in mind, Judge, at all.

14         THE COURT:     Okay.  You've already

15    gone through withdraw?

16         THE DEFENDANT:     I haven't been --

17    I haven't used since October 7th.

18         THE COURT:     That was October 7th

19    the last time you used?

20         THE DEFENDANT:     Yeah, I haven't

21    used anything since then.  I ain't been

22    withdrawing, I've just been depressed in here.

23         THE COURT:     I'll call her today --

24    talk to her this morning.  You'll be hearing

25    from us shortly.  I'll call your dad, too.

11

```
 1              THE DEFENDANT:     How will I hear
 2     from you guys?
 3            THE COURT:    Can you call your dad?
 4            THE DEFENDANT:    He won't pick up
 5     the phone.
 6            THE COURT:    He won't pick up the
 7     phone?
 8            THE DEFENDANT:     He can't afford
 9     the calls.
10            THE COURT:    Why?
11            THE DEFENDANT:    Because they're $7
12     apiece, and he can't afford it.
13            THE COURT:    Sheriff will come to
14     you and let you know what our decision is, all
15     right?
16            THE DEFENDANT:    Okay.
17                  - - - - -
18        (Thereupon, Court was adjourned.)
19                  - - - - -
20
21
22
23
24
25
```

12

```
 1              C E R T I F I C A T E
 2              I, Michelle L. Simko, Official Court
 3    Reporter for the Court of Common Pleas,
 4    Cuyahoga County, Ohio, do hereby certify that
 5    as such reporter I took down in stenotype all
 6    of the proceedings had in said Court of Common
 7    Pleas in the above-entitled cause; that I have
 8    transcribed my said stenotype notes into
 9    typewritten form, as appears in the foregoing
10    Transcript of Proceedings; that said transcript
11    is a complete record of the proceedings had in
12    the trial of said cause and constitutes a true
13    and correct Transcript of Proceedings had
14    therein.
15
16
17
18
19
20              Michelle L. Simko
21              Michelle L. Simko, RPR
22              Official Court Reporter
23              Cuyahoga County, Ohio
24
25
```